



**Tammy Bowles Raines**
Law Office, PLLC

PHONE:  (304) 395-5925                                   227 CAPITOL STREET, SUITE 201
EMAIL:   tbraineslaw@gmail.com                            CHARLESTON, WV  25301
FAX:  (888) 695-7453

November 1, 2018

Julie Ball, Circuit Clerk
Mercer County Courthouse
1501 Main Street
Princeton, WV 24740

     RE:    Jason Lambert v. The Kroger Co.; Civil Action No: 18-C-291

Dear Ms. Ball:

     Enclosed for filing, please find the original *"Certificate of Service"* for *"Plaintiff's First Set of Interrogatories, Requests for Production of Documents and Requests for Admissions"* which have been transmitted to the Secretary of State's office for service upon the Defendant along with the Summons and Complaint.

     Thank you for your attention to this matter.   Should you have any questions or concerns, please feel free to contact me.

             Very truly yours,

             *Tammy Bowles Raines*

             Tammy Bowles Raines

cc:    Anthony M. Salvatore, Esq.
       Jason Lambert



EXHIBIT

A



## Notice of Service of Process

**null / ALL**
**Transmittal Number: 18951724**
**Date Processed: 11/12/2018**

| Primary Contact: | Venessa C. Wickline Gribble<br>The Kroger Co.<br>1014 Vine Street<br>Cincinnati, OH 45202-1100 |
|---|---|

| Entity: | The Kroger Co.<br>Entity ID Number  2171751 |
|---|---|
| Entity Served: | The Kroger Co. |
| Title of Action: | Jason Lambert vs. The Kroger Co. |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Discrimination |
| Court/Agency: | Mercer County Circuit Court, WV |
| Case/Reference No: | 18-C-291 |
| Jurisdiction Served: | West Virginia |
| Date Served on CSC: | 11/09/2018 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Certified Mail |
| Sender Information: | Tammy Bowles Raines<br>304-395-5925 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

## SUMMONS
## IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

**JASON LAMBERT,**

    **Plaintiff,**

**v.**

    Civil Action No: 18-C-291

    Judge: Sadler

**THE KROGER CO.,**

    **Defendant.**

**To:**     **THE KROGER CO.**
        **CORPORATION SERVICE COMPANY**
        **209 WEST WASHINGTON STREET**
        **CHARLESTON, WV 253 02** *per By Penixson*

    **IN THE NAME OF THE STATE OF WEST VIRGINIA,** you are hereby summoned and required to serve upon Tammy Bowles Raines, Plaintiff's attorney, whose address is 227 Capitol Street, Suite 201, Charleston, WV 25301, and Anthony M. Salvatore, Esq., 204 N. Court Street, Fayetteville, WV 25840, an answer, including any related counterclaim you may have, to the Complaint filed against you in the above styled civil action, a true copy of which is herewith delivered to you. You are required to serve your answer within **thirty (30) days** after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint and you will be thereafter barred from asserting in another action any claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated: 10/22/18

        *Julie Ball*
        CLERK OF COURT

        *By Her Deputy*

        *Crystal Worley*

FILED

OCT 2 2 2018

JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

## IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

**JASON LAMBERT,**

    **Plaintiff,**

**v.**

    Civil Action No. 18-C-291

    Judge: _____Sadler_____

**THE KROGER CO.,**

    **Defendant.**

### COMPLAINT

COMES NOW the Plaintiff, Jason Lambert, by Counsel, Anthony M. Salvatore and Tammy Bowles Raines, and for his Complaint of discriminatory employment practices against the Defendant state as follows:

1.    The Plaintiff, Jason Lambert, brings this action against the Defendant for its discriminatory employment practices against the Plaintiff. Plaintiff's claims involve certain West Virginia common law and statutory causes of action, including those pursuant to W.Va. Code §5-11-1 et seq. Subject matter jurisdiction is therefore appropriately vested in this Court.

2.    Plaintiff Jason Lambert is 38 years old, and was at all times relevant herein, a resident of Mercer County, West Virginia.

3.    Defendant, The Kroger Co. (hereinafter "Kroger") is a corporation and at all times relevant herein was doing business in Mercer County, West Virginia. Specifically, Plaintiff worked at the Bluewell store location in Mercer County when he was terminated, making venue appropriate pursuant to W.Va. Code §56-1-1.

1

## FACTS

4.      Plaintiff Jason Lambert was employed by the Defendant since the age of 17 and his first job position was a bagger in the Bluefield, Virginia location.

5.      Within one year, Plaintiff was moved to meat department working in both Bluefield, Virginia and Bluefield, West Virginia locations.  As a meat cutter, Plaintiff was also a shop steward for the store acting as the union representative for the employees.

6.      Plaintiff entered the management training program after eight (8) years working as a store clerk.  In, 2006, Plaintiff was promoted to co-manager.

7.      As a co-manager, Plaintiff worked in the following stores: Princeton, West Virginia; Beaver, West Virginia; and Beckley, West Virginia. These transfers were common among management staff.  In all of Plaintiff's evaluations over the course of this time, Plaintiff met or exceeded expectations.

8.      In 2006, in the same year that Plaintiff was promoted to store management staff, the District Manager placed Plaintiff on a special assignment.  Plaintiff was responsible for rolling out a new company plan, Key Retailing.  Plaintiff worked at the district level visiting all district meat departments to put the new plan in place. In 2007, Plaintiff was placed on another district level special assignment to roll out key retailing in deli and grocery departments for all district stores.

9.      Within about two years of Plaintiff's promotion to co-manager, the former District D manager was replaced.   The new manager was responsible for transferring Plaintiff to the Beckley, West Virginia (Harper Road Location) store.  It was Plaintiff's understanding, per management, that this placement at Harper Road was because the store was not making money.

2

The year prior to Plaintiff's placement at Harper Road location, the store lost $200,000.00. The year Plaintiff was placed at Harper Road location, the store made $400,000 plus. Because of his performance in bringing the store out of the red, Plaintiff was given two evaluations in which he received "exceed standards". It was also during this time that Plaintiff worked alongside local law enforcement to launch a theft campaign at his store that led to Five Hundred Thirteen (513) captured theft attempts. Plaintiff's team was recognized by the Roanoke, Virginia Kroger office with gift cards for their efforts.

10. In May 2013, Plaintiff applied for and was promoted to district level B meat coordinating position. Plaintiff had the responsibility of managing 17 meat departments in this district. Matt Tait, District Manager B, interviewed and promoted Plaintiff to this position.

11. During the Plaintiff's employment, the Plaintiff consistently performed his duties in a satisfactory manner and met the reasonable expectations of the employer. At no time during his position as meat coordinator did Plaintiff ever receive any reprimands for poor performance.

12. On or about January 9, 2015, Plaintiff was called to a meeting in District Manager B Matt Tait's office, without notice. Only Mr. Tait and Plaintiff were present. In this meeting, Plaintiff was told that he would go back in a store as a co-manager or he would be set up to be fired. Mr. Tait sent an email to the district staff that was completely false, stating Plaintiff made the decision to go back in the store as a co-manager because that is what is best for his family.

13. In January 2015, Plaintiff spent four weeks working in the Boonsboro, Virginia Kroger store. Plaintiff then requested a transfer to the Princeton, WV store because it is his hometown. The transfer was granted and Plaintiff was no longer in Matt Tait's district.

3

14.    In January, 2015, the District 2 Manager called Plaintiff to welcome him as a member of management in his district.  He thanked Plaintiff for joining the district and was "grateful to have someone with his experience in my district."

15.    In April 2015, Matt Tait was transferred to the district manager position in District 2, essentially following Plaintiff to his new district.

16.    At the Princeton, WV Kroger location, Plaintiff worked with Kristen Farley as co-managers.

17.    In July 2015, Plaintiff was transferred per the DM, Matt Tait, to Bluewell, WV as a co-manager. Bluewell store manager told Plaintiff that he requested a manager that could help him run the store when he was not there.  Since Bluewell is a small store, there are only two managers and with days off, meetings, vacations, etc. the managers at this store must have the ability to work independently with no guidance because in any given week the managers are usually only working three days or less a week with each other.

18.    In July 2015, Plaintiff began seeing a health care professional for the anxiety that he was experiencing with his job.

19.    Within two weeks of Plaintiff's arrival in the Bluewell store, the prior manager who had requested help in the store was transferred to Kingsport, TN. The store was vacant of a head store manager for one month, in which Plaintiff was the only manager on duty.  Plaintiff performed all duties of head and co-manager for four (4) weeks. Matt Tait, District Manager, did not send any managers from other stores to assist in the job duties or grant Plaintiff relief for any days off. During this time, Plaintiff was the manager in charge of all job duties at Bluewell store successfully.

4

20.    Plaintiff received an interview for the position of head manager at the Bluewell, WV store along with several other managers. Plaintiff was not offered the position.

21.    Travis Bower was selected as the Bluewell store manager. Plaintiff and Mr. Bower worked together well as the management staff in Bluewell for fifteen (15) months.

22.    Plaintiff proved to be a strong member of management at the Bluewell store. So much so that Travis Bower asked Plaintiff to transfer to the Rocky Mount, Virginia store with him to be his co-manager when he transferred there in 2017.

23.    In July 2016, Travis Bower informed Plaintiff that District Manager Matt Tait sent him to the Bluewell store after a district meeting to see if Mr. Bower could smell alcohol on Plaintiff. Mr. Bower informed Mr. Tait that he could not smell alcohol on Plaintiff. The following day, Matt Tait came to the store to speak with Plaintiff about his concern of smelling alcohol. Plaintiff volunteered to go take a test. District Manager Matt Tait said that was not necessary at that time. Mr. Tait inquired of the Plaintiff about any medication that the Plaintiff was on. Plaintiff informed Mr. Tait that it was none of his business nor Kroger what medications Plaintiff takes. Plaintiff reminded Mr. Tait of his comment regarding setting Plaintiff up to be fired. Tait responded to the Plaintiff to let it go.

24.    Travis Bower transferred to Rocky Mount, VA at the end of 2016. Once again, the Bluewell store was vacant of a head store manager. However, Plaintiff was still there as the co-manager with 19 years of experience and excellent employee evaluations. Plaintiff considered applying for the position again.

25.    On January 2, 2017, Matt Tait came to the Bluewell store and introduced Kristen Farley as the new store manager. During the store announcement to all store associates, Matt Tait

looked at Plaintiff and said, "what do you think about that Jason"?   Naturally, Plaintiff was disappointed over the way in which the situation was handled but Plaintiff did not respond.

26.   Plaintiff's experience was that it was company policy for these positions to be posted, giving a chance for those interested to apply and have an opportunity to receive an interview. Plaintiff did not know to apply.

27.   Plaintiff was denied the opportunity to apply and be interviewed for Store Manager position at the Bluewell location.   Plaintiff had more experience, in management, and otherwise with the Kroger Company than Kristen Farley.    The store manager position came with a $17,000 store bonus each year.

28.    Only five (5) weeks after Kristen Farley took over as store manager, on February 9, 2017, Plaintiff was called in to the management office at Bluewell, where Kristen Farley, store manager, and the store secretary were present. Ms. Farley told Plaintiff that he smelled of alcohol.

29.   Plaintiff was escorted from the store, placed in Ms. Farley's vehicle along with the secretary and taken to Bluefield Regional Medical Center for a ten panel drug test and urine test.

30.   Plaintiff endured privacy violations in the way the tests were performed and his confidentiality.

31.   While Plaintiff and the Kroger secretary sat in the waiting area, they observed Kristen Farley go into the sample collecting room where the nurse took Plaintiff's blood sample and spoke with the nurse.

32.   Plaintiff was made to wait two (2) weeks for test results.  Plaintiff attempted to contact the Human Resource Coordinator for District 2.   However, after sixteen (16) attempts, the Kroger employee did not answer Plaintiff's phone calls.

6

33.     Plaintiff then contacted the Human Resource office in Roanoke, V.A. Plaintiff
spoke with a Human Resources employee in the Roanoke office. During this conversation,
Plaintiff made a complaint about the drug test and cited harassment for the reason behind the test.
Plaintiff inquired when he was going to return to work.

34.     While out on suspension, pending the results of the drug test, Plaintiff's mother,
Judy Lambert, was shopping at the Princeton Kroger. Plaintiff's mother was approached by a
Kroger clerk. This employee reported to Plaintiff's mother that he heard, "Jason was escorted out
of the building, drug tested, and fired."

35.     Defendant Kroger Company did not follow its policy regarding confidentiality as
indicated by this conversation.

36.     Finally, after two weeks of being out on suspension, Plaintiff received a phone call
from Kristen Farley that he was to meet both her and Matt Tait at Starbucks in Princeton, West
Virginia to discuss his return to work.

37.     On February 24, 2017 at Starbucks, Matt Tait told Plaintiff that Plaintiff passed
the drug test which was no surprise to the Plaintiff. Matt Tait told Plaintiff that he had probable
cause to have Plaintiff tested yet never told Plaintiff what was the probable cause. Matt Tait told
Plaintiff he would be "watched" and if Plaintiff was suspected of alcohol, Matt Tait would drive
to the store and take Plaintiff to a "doc in the box" himself. Matt Tait further stated that the lab
technician told Kristen Farley that, "it is obvious that he (Plaintiff) is under the influence."

38.     Plaintiff returned to work on Monday, February 27, 2017 as a co-manager at the
Bluewell location.

39. In the time following Plaintiff's return, one of the employees reported to Plaintiff that Kristen Farley collected information from store associates after Plaintiff was suspended for the drug test. According to this employee, Ms. Farley went around the store during Plaintiff's suspension with a notebook asking associates to make documentation of incidents of times where they thought Plaintiff was under the influence of alcohol. In fact, another store associate in Bluewell was asked six (6) times to provide documentation about Plaintiff and he relayed to Plaintiff that he felt pressured to give her the information she wanted. This was apparently being collected to verify and support the false allegations against Plaintiff prior to his suspension.

40. On April 19, 2017, Plaintiff took medical leave for twelve (12) weeks in order to have back surgery. Prior to his medical leave, Plaintiff spoke with Kristen Farley about his upcoming evaluation, in which she said that it was a three, meaning "meets standards".

41. On June 22, 2017, Matt Tait sent Plaintiff a text message to question how Plaintiff's recovery was going. Plaintiff responded that he was following doctor's orders. Matt Tait responded with "good I need you back."

42. Plaintiff was released to return to work twelve (12) weeks after his surgery. During a phone conversation with Matt Tait, Mr. Tait described the news of Plaintiff's return to work as "the best news he had all day." Plaintiff returned to the Bluewell store on July 14, 2017.

43. On July 17, 2017, Kristen Farley sat down with Plaintiff to go over Plaintiff's performance evaluation for 2016. After completing the evaluation with plaintiff and no indication that his performance was lacking in any area, Ms. Farley informed Plaintiff that the final evaluation score was a two, meaning "needs improvement".

44. Plaintiff questioned the evaluation, but Ms. Farley was not able to tell Plaintiff why he received a score of two. The comments on the evaluation did not match the numerical score

8

given at the end of the evaluation. At no time prior to July 17, 2017 did Plaintiff's direct manager or management in the district office give Plaintiff any indication that there was a problem with Plaintiff's job performance.

45.    Plaintiff's prior co-worker, Travis Bower, was responsible for Plaintiff's 2016 employee evaluation.  Plaintiff called Travis Bower, and he informed plaintiff that a numerical three (meet standards for company) was given to Plaintiff and he gave the Kroger store secretary the same numerical score of a three.    However, Plaintiff ended up receiving  a two (needs improvement) and the secretary received a four (exceeds expectations).  These numerical scores are tied to receiving a raise; therefore, Plaintiff did not receive a raise but the store secretary received a four percent raise.

46.    Travis Bower explained to Plaintiff that the evaluations did not reflect his evaluations that were sent to human resources. It was obvious that someone had changed the ratings at the bottom of the Plaintiff's evaluations and yet, the comments do not reflect the ratings. In Plaintiff's evaluation, comments indicate that Plaintiff was a "model for customer service" and there is little to almost no comments on how to make improvements on his performance.  Plaintiff checked his information in human resources online, and it showed a one cent raise.

47.    On September 1, 2017, Plaintiff had officially served 20 years with Kroger. It is customary that store management and district managers  make a big deal out of service milestones. Often, even five and ten year employees get gifts, emails, recognitions, visits from district managers.    On this date, a Kroger clerk came to Plaintiff's office and handed him a watch that came in the mail.  She said, "here this came for you today."  There was no other mention of Plaintiff's service to the company.

9

48.     On October 20, 2017, Kroger management met with Kristen Farley and Plaintiff at Bluewell Kroger to put Plaintiff on a pre-performance improvement plan that would last four weeks.  During this meeting, Plaintiff asked upper management why he received a two on his evaluation since he consistently rated number one in the division of 20 stores in his job duties and was told that it was performance based not metrics based.

49.     On October 23, 2017, Kristen Farley was required to meet with Human Resources because of an anonymous complaint that was sent to the Human Resources regarding inappropriate conduct.  Human resources was called in for a day wherein they listened whiles employees were given an opportunity to voice concerns over Ms. Farley.  Plaintiff was not given an opportunity to speak because he was on vacation and not informed of this opportunity.  Despite these concerns and complaints, no disciplinary action was taken against her.

50.     On November 17, 2017, Vice President of Operations visited Bluewell Kroger with a team of individuals from the Roanoke office.  The purpose of this visit was to do a holiday check on the store.  Upon entering the store, the Vice President thought Plaintiff was the store manager, stating "I didn't know this was your store."  Plaintiff heard comments such as "this is the best merchandised store I have seen in 30 store visits."  Plaintiff responded that was interesting considering that Matt Tait had Plaintiff on an improvement plan for his performance.  The reply was generally that "you can't tell it by looking here."

51.     On December 14, 2017, Plaintiff was the only manager on duty.  Plaintiff messaged the Kroger operations coordinator to let her know that he had a doctor's appointment and would be out of the store.  It is customary to message this employee when management is out of the store.  While at the doctor's appointment, Plaintiff received a text message from Kristen Farley questioning why he was out of the store.  Upon s return the following day, she took Plaintiff to her office and questioned his absence.  Ms. Farley stated, "this looks really bad on you."  Plaintiff

informed her that he had a doctor's excuse for his absence. Ms. Farley replied that she wanted to know the purpose of Plaintiff's doctor visit. Plaintiff did not give her any further information as it was not a requirement.

52.     During the 2017 holiday season, the co-manager at the Princeton store informed Plaintiff that she received a two on her performance evaluation. However, this manager was not on an improvement plan at that time and informed Plaintiff that she hoped Kroger would not do so as it was her first year in management.

53.     On December 23, 2017, Matt Tait visited the Bluewell Kroger store. During this visit, Mr. Tait shook Plaintiff's hand and thanked him for the store conditions. Mr. Tait never mentioned Plaintiff's improvement plan.

54.     On December 24 (Christmas Eve), Matt Tait called the store and spoke with Plaintiff to request Plaintiff's presence in the store while Kristen Farley closed it down at 6:00p.m. because, according to Mr. Tait, "she did not know how to close the store" and Mr. Tait "did not want an unsecure store". Plaintiff was required to show Kristen Farley, store manager, how to close the store and how to check the store on Christmas Day.

55.     On January 17, 2018, Plaintiff received a phone call from a new management hire to schedule a drug test for a job offer from Kroger, possibly in Bluewell store. Kristen Farley drug tested this young lady. Plaintiff told Kristen Farley that he would not drug test his replacement. Ms. Farley did not deny that this new hire was Plaintiff's replacement. The new hire is female, younger than Plaintiff and would be doing the same job as the Plaintiff but for less money.

56.     Part of Plaintiff's PIPP (improvement) plan included speaking with ten associates and creating a personal impact plan based on these comments. Once Plaintiff spoke with ten clerks to gather feedback on ways that he could improve his performance, he put together a personal

impact plan. When submitted to Kroger upper management, Kristen Farley relayed their message and informed Plaintiff that it should be metric based. At this point, Plaintiff was totally confused because in the original meeting with management, Plaintiff was told to focus on behavior instead of metrics. The following week, Kristen Farley was reported to be circulating the store asking associates about Plaintiff's performance while on the sales floor. It is against company policy to discuss these plans with clerks; however, at this point, the entire store was aware of this plan and the potential for my Plaintiff's termination.

57.    On January 23, 2018, a Kroger shop steward and clerk in Bluewell reported to Plaintiff that Kristen Farley discussed Plaintiff's PIPP plan with him and another store clerk. Kristen Farley told these employees that any feedback Plaintiff receives from store associates on making personal improvements in Plaintiff's plan was most likely not truthful information from the associates. One employee told Ms. Farley that he was honest in speaking with Plaintiff about personal improvements because he didn't feel that there was anything that Plaintiff could do better and she reportedly rolled her eyes. Again, Kristen Farley discussing Plaintiff's PIPP plan is a violation of company policy with regard to confidentiality.

58.    On Wednesday, January 24, 2018, Kristen Farley asked Plaintiff if it was okay with him if she could share an uplift story about his customer service skills that she frequently observed as the company was focusing on uplift (special things that managers do to promote customer service). Ms. Farley noticed how often Plaintiff gives dollars to kids and how Plaintiff would purchase items like teddy bears out of my own pocket for children. Ms. Farley wanted Plaintiff's permission to share these examples as recognition for the store.    Plaintiff told her that he did not do those things for Kroger that he did those things because it was the right thing to do.

59.    In the last four weeks of Plaintiff's employment, he took every operations conference call, one head manager conference call, at least two human resource conference calls,

and all four merchandising conference calls. Throughout the last sixty days of his employment, Plaintiff was consistently told that the documents he was sending in on Friday were all insufficient. Plaintiff was still required to take the responsibility of the store manager.

60.     On Thursday, January 25, 2018, Kroger upper management called Plaintiff at the store and informed Plaintiff that he had a meeting in Roanoke the following day. On Friday, January 26, 2018, Plaintiff met with Matt Tait and other management at the Roanoke Kroger office in Virginia.   There was no one in the meeting who represented the Human Resource Department. At this time, Plaintiff was asked to resign or be terminated.  Plaintiff told these individuals that he would not resign.  Plaintiff turned his store key in and was escorted from the building.  During the walk to the front door, one of the individuals said to Plaintiff, "I really hate this." Plaintiff responded "He (Matt Tait) told me three years what he was going to do."

61.     On Thursday, February 1, 2018, one week after termination, Plaintiff called Human Resources to request his termination letter and information about COBRA health insurance.  The person he spoke with said she was not aware that Plaintiff had been terminated. Plaintiff called his health insurance company to check on dates of coverage. Kroger had not contacted the health insurance about Plaintiff's termination.

## COUNT I- West Virginia Human Rights Act (Age Discrimination)

62.     Plaintiff incorporates each and every allegation contained above as if fully stated herein.

63.     Plaintiff was replaced with a younger female who was paid less than Plaintiff.  The Plaintiff's termination from employment was based upon, in whole or in part, the Plaintiff's age, in violation of the West Virginia Human Rights Act, W. Va. Code §5-11-1, et seq. The Defendant's actions amount to unfair age discrimination in violation of the West Virginia Human Rights Act.

13

64. As a direct and proximate result of the Defendant's actions, the Plaintiff has suffered and will continue to suffer lost wages and benefits in an amount to be determined by the jury.

65. As a direct and proximate result of the Defendant's actions, the Plaintiff is entitled to damages for indignity, embarrassment, humiliation, annoyance and inconvenience in an amount to be determined by the jury.

66. The Defendant's actions were willful, wanton and/or undertaken with reckless disregard and/or reckless indifference to the rights of the Plaintiff, thereby entitling the Plaintiff to punitive damages in an amount to be determined by the jury.

### COUNT II- West Virginia Human Rights Act (Gender Discrimination)

67. Plaintiff incorporates each and every allegation contained above as if fully stated herein.

68. Plaintiff was replaced with a younger female who was paid less than Plaintiff. The Plaintiff's termination from employment was based upon, in whole or in part, the Plaintiff's gender in violation of the West Virginia Human Rights Act, W. Va. Code §5-11-1, et seq. The Defendant's actions amount to unfair gender discrimination in violation of the West Virginia Human Rights Act. Plaintiff (male) was treated unfairly in all respects by Defendant during his employment insofar as other similarly situated female employees received less severe discipline, and/or even received promotions and pay raises whereas Plaintiff was disciplined more harshly and passed over for better job opportunities and pay increases.

69. As a direct and proximate result of the Defendant's actions, the Plaintiff has suffered and will continue to suffer lost wages and benefits in an amount to be determined by the jury.

14

70. As a direct and proximate result of the Defendant's actions, the Plaintiff is entitled to damages for indignity, embarrassment, humiliation, annoyance and inconvenience in an amount to be determined by the jury.

71. The Defendant's actions were willful, wanton and/or undertaken with reckless disregard and/or reckless indifference to the rights of the Plaintiff, thereby entitling the Plaintiff to punitive damages in an amount to be determined by the jury.

72. The Defendant's actions were willful and malicious and violated the West Virginia Human Rights Act entitling the Plaintiff to attorney fees and costs pursuant to West Virginia Code §5-11-1 and/or the decisions of the West Virginia Supreme Court of Appeals.

## COUNT III- (Intentional Infliction of Emotional Distress)

73. Plaintiff incorporates each and every allegation contained above as if fully stated herein.

74. By engaging in a pattern of discriminating employment practices, Defendant engaged in outrageous conduct which intentionally or recklessly caused the Plaintiff to suffer severe emotional distress.   Specifically, by accusing Plaintiff of being under the influence of drugs and/or alcohol and despite testing that showed he was not under such influence, Defendant engaged in a practice of violating confidentiality by spread false rumors and information regarding his actions.

75. As a direct and proximate result of this misconduct, the Plaintiff suffered severe emotional distress, embarrassment, indignity, humiliation and mental anguish.

76. Defendants actions were willful, wanton, reckless and malicious and/or undertaken in the direct disregard for the civil rights and sensibilities of the Plaintiff entitling him to damages including punitive damages, and attorney's fees and costs.

15

WHEREFORE, the Plaintiff prays the Court to set a JURY TRIAL in this matter, award damages as set forth in this Complaint, including lost wages, benefits, back pay, front pay, damages for indignity, embarrassment, humiliation, annoyance, inconvenience, punitive damages, prejudgment interest as provided by law, attorney fees and costs, and any and all such further relief this Honorable Court may deem just and proper

**THE PLAINTIFF DEMANDS A JURY TRIAL.**

**JASON LAMBERT**

**By counsel,**

Tammy Bowles Raines, Esq.  (W.Va. Bar#9708)
*Tammy Bowles Raines Law Office, PLLC*
227 Capitol Street, Suite 201
Charleston, WV  25301
Telephone: (304) 395-5925
Facsimile: (888) 695-7453
*Counsel for Plaintiff*


Anthony M. Salvatore, Esq.  (W.Va. Bar#7915)
*Hewitt & Salvatore, PLLC*
204 N. Court Street
Fayetteville, WV  25840
Telephone: (304) 574-0272
Facsimile: (304) 574-0273
*Counsel for Plaintiff*

16